# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JULIE A. BATH, | ) | CASE NO. 3:19-CV-01747 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Julie A. Bath, ("Plaintiff" or "Bath"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a

Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Titles II and XVI of

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge

pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For

the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

On March 29, 2016, Bath filed an application for POD and DIB, alleging a disability onset date of February 18, 2016 and claiming she was disabled due to disorder of the vestibulary system, affective disorder, and anxiety disorder.  (Transcript ("Tr.") at 198, 23.)  The applications were denied initially and upon reconsideration, and Bath requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 142.)

On January 24, 2018, an ALJ held a hearing, during which Bath, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 20.)  On June 14, 2018, the ALJ issued a written decision finding Bath was disabled from February 18, 2016 through May 10, 2017, but not disabled since May 11, 2017.  (*Id.* at 20-36.)  The ALJ's decision became final on June 4, 2019, when the Appeals Council declined further review.  (*Id.* at 1.)

On August 1, 2019, Bath filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 13, 14.)  Bath asserts the following assignments of error:

> Whether the administrative law judge erred in finding medical improvement in Ms. Bath's residual functional capacity, sufficient for a return to work (thus closing the period of disability), where he failed to follow Social Security's own rules for the evaluation of the intensity, persistence, and limiting effects of Ms. Bath's symptoms after May 10, 2017, and he misrepresented the treatment record.

(Doc. No. 11 at 1.)

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

Bath was born in May 1970, and was 45 years-old on her alleged disability onset date, making her a "younger" individual under social security regulations.  (Tr. 28, 198.)  *See* 20 C.F.R. §§

2

404.1563 & 416.963.  She has at least a high school education and is able to communicate in English.  (*Id.* at 28.)  She has past relevant work as a catering manager, advertising sales representative, home furnishings sales representative, collections clerk, hotel/motel manager, business services sales agent, and general merchandise sales.  (*Id.* at 28.)

**B.      Relevant Medical Evidence[2] - Physical Impairments[3]**

On February 19, 2016, Bath sought treatment in the emergency room for chest pain. She reported that, the previous day, she had to leave work because of chest pain, nausea, a headache or lightheadedness, and occasional cold sweats. (Tr. 313.)  She was diagnosed with palpitations, chest pain, and benign paroxysmal positional vertigo ("BPPV"), and given a prescription for Meclizine and a 24-hour monitor to monitor her heart's activity. (*Id.* at 313, 318).

On February 28, 2016, Bath followed up with her primary care physician, Bryan Kuns, D.O.  (*Id.* at 535.)  She was using a walker to "help with her significant vertigo." (*Id.* at 536.)   She also continued to have cephalgia.[4]   (*Id.*)   He continued her Meclizine, Fleceril, and Relpax prescriptions.  (*Id.* at 537.)

On March 21, 2016, Bath returned to Dr. Kuns, reporting no improvement in her BPPV and cephalgia.   (*Id.* at 538.)  She continued to use a walker to help with her vertigo, and reported "a

---

[2]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3]  Bath stated that she has focused her appeal "primarily" on her physical impairments. (Doc. No. 11 at 5.)  In fact, neither party cited evidence relating to her mental impairments, and Bath does not challenge the RFC findings of the ALJ in that area. Therefore, no evidence relating to her mental impairments is recited herein.

[4]  Cephalgia are headaches. *Dorland's Illustrated Medical Dictionary,* 333 (30th ed. 2003).

constant headache" that had not subsided despite starting Percocet.  (*Id.*)  Dr. Kuns referred Bath for evaluations by a neurologist, an ophthalmologist, an audiologist, and an ENT.  (*Id.* at 337-40, 400-03, 392-99.)

On March 24, 2016, Bath began treatment with neurologist Brendan Bauer.  (*Id.* at 409.) Bath reported that her headaches were constant but varied in intensity, and she felt like she was swaying while sitting or standing up.  (*Id.*)  She was using a walker for balance and reported falls. (*Id.*)  Upon examination, Dr. Bauer observed gait ataxia, as well as severe neck spasms and limited range of motion consistent with cervicogenic headache and vertigo. (*Id.* at 409.)  He diagnosed muscle spasms of neck, migraine, gait ataxia, and vertigo.  He prescribed Prednisone and Cyclobenzaprine. (*Id.* at 409-14.)

On March 28, Bath returned to Dr. Kuns, reporting no change in her vertigo or headaches. (*Id.* at 535.)

On April 5, 2016, Bath had an x-ray of her cervical spine and a brain MRI, which were both negative.  (*Id.* at 415-16.)

On April 18, 2016, Bath returned to Dr. Kuns, reporting her BPPV was "pretty much the same" and she had woken one morning without a headache, although it returned in the afternoon. (*Id.* at 531.)  She described this as "the first time in 9 weeks she was pain free." (*Id.*)  Dr. Kuns noted she continued to use a walker for ambulation.  (*Id.* at 533.)

On April 28, 2016, Bath saw Dr. Bauer for a follow up after her brain MRI.  (*Id.* at 458.)  She reported constant headaches, with only 2 hours of relief when she went to the ER and was treated with dilatid.  (*Id.*)  She reported her dizziness and weakness were getting worse, and physical therapy left her "completely wiped out." (*Id.*)  He prescribed Indometocin, Flexeril and Cyproheptadine. (*Id.*

4

at 461.)

On May 2, 2016, Bath returned to Dr. Kuns and reported that she had begun taking Indometocin and Cyproheptadine, but was not yet experiencing improvement in her vertigo. (*Id.* at 528.) Dr. Kuns described her as "somewhat improved from previous visits," but still suffering intermittent vertigo. (*Id.* at 529.)

On June 13, 2016, Bath returned to Dr. Kuns, seeking treatment for high blood pressure. (*Id.* at 523.) She reported being "very shaky" and having "a slight headache." (*Id.*) Bath wore a walking boot, because she had fallen and broken her leg due to the vertigo. (*Id.* at 523-27.)

On June 29, 2016, consultative examining psychologist Wayne Morse observed that Bath had "a difficult time walking and used a walker to ambulate." (*Id.* at 451.)

On June 25, 2016, Bath returned to Dr. Kuns and reported that her headaches continued daily and some days were better than others. (*Id.* at 520.) She had tried stopping the Indomethacin on the recommendation of a neurologist that she had seen for a second opinion. (*Id.* at 522.) However, the headaches became worse so she restarted the medication after talking to Dr. Bauer's office. (*Id.*)

On July 6, 2016, Bath returned to Dr. Bauer for an autonomic nervous system evaluation, including tilt table testing, was abnormal and showed evidence of autonomic dysfunction. (*Id.* at 486-88.) Bath reported that her headaches were constant, three to four days a week she experienced bad pounding headaches, and she felt dizzy, weak, and tired. (*Id.* at 481.) Dr. Bauer's examination again showed gait ataxia and severe neck spasms and limited range of motion. (*Id.* at 481-85.) He adjusted her medications, and noted, "Will send for depacon and magnesium infusions for persistent headache." (*Id.* at 484.)

Between July 29, 2016 and August 1, 2016, Bath had a three-day series of Depacon and

5

magnesium infusions. (*Id.* at 378-86.)

On November 9, 2016, Bath returned to Dr. Bauer in November 2016. (*Id.* at 658.) She reported that she was out of the Indomethacin and was "getting the bad headaches." (*Id.*) The infusions had helped her, but she was still getting headaches at least two to three times per week. (*Id.*) Dr. Bauer's examination again showed gait ataxia and severe neck spasms and limited range of motion. He adjusted dosages and refilled her Trileptal, Indomethacin, Cyproheptadine and Zanaflex. (*Id.*)

Bath had three-day treatments of Depacon and magnesium infusions in October 2016, November 2016, January 2017, and February 2017. (*Id.* at 688-701.)

On February 16, 2017 Bath returned to Dr. Bauer and reported constant headaches and dizziness, as well as vertigo. (*Id.* at 653.) He prescribed Singulair and Indomethacin. (*Id.* at 656.)

A brain MRI taken on February 28, 2017, was negative. (*Id.* at 650-51.)

On March 15, 2017, Bath saw Dr. Bauer again, still reporting headaches, dizziness and weakness, although the vertigo was less frequent, and her pain was reduced. (*Id.* at 646.) Dr. Bauer prescribed Levaquin and Prednisone. (*Id.* at 649.)

On May 10, 2017, Bath returned to Dr. Bauer and reported that she was "doing a lot better." (*Id.* at 642.) She was "still getting headaches but not as often or as long, still dizzy on and off but improved" and she had more lightheadedness. (*Id.*) Dr. Bauer continued her medications. (*Id.* at 645.)

In September 2017, Ms. Bath required another series of Depacon and magnesium infusions. (*Id.* at 682-87.)

On July 21, 2017, Bath went to the ER for rectal bleeding. (*Id.* at 672.)

6

On July 26, 2017, she had a follow up appointment with Dr. Kuns to address her gastrointestinal issues. (*Id.* at 663.) Dr. Kuns noted she had "significant headache[s]," and reported falling due to her vertigo. (*Id.* at 663-64.) He noted on examination that vertigo limited the range of motion in her spine, and she had gained 40 pounds in the past year, although she had normal gait and her range of motion in her extremities remained within normal limits. (*Id.* at 664.)

On August 3, 2017, Bath had a colonoscopy with a polypectomy. (*Id.* at 667.)

For three days in September 2017, Bath received Depacon and magnesium infusions therapy to treat migraine headaches. (*Id.* at 682-83.)

**C.      State Agency Reports -Physical Impairments**

On June 10, 2016, state agency reviewing physician Gail Mutchler opined that, in an eight-hour workday, Bath could:

- •        lift/carry 10 pounds frequently and 20 pounds occasionally;

- •        stand/walk for four hours and sit for about six hours;

- •        never climb ladders, ropes, or scaffolds;

- •        occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and

- •        should avoid all exposure to hazards, driving, and unprotected heights.

(*Id.* at 101-02.)

On October 24, 2016, state agency reviewing physician Esberdado Villanueva concurred with the opinion of Dr. Mutchler. (*Id.* at 119-21.)

**D.      Hearing Testimony**

During the January 24, 2018 hearing, Bath testified to the following:

- •        She lives in Sandusky, Ohio, with her husband. (*Id.* at 47.)

7

- She is right-handed. (*Id.*)

- She has medical insurance through her husband. (*Id.* at 47-48.)

- She has a driver's license, but no longer drives because of her vertigo. (*Id.* at 48.)

- She finished one year of college. (*Id.*)

- She last worked in February 2016, at Whirlpool, through Kelly Services. That job lasted four or five months. (*Id.*)

- In 2014, she worked for Sawmill Creek Resort in Heron, Ohio, as a catering and sales manager. In that job, she gave tours of the property to potential clients, and helped plan and execute events. She occasionally lifted up to 50 pounds. (*Id.* at 48-49.)

- In 2015, she worked for Gannett as a customer service and sales representative for newspaper and digital ads. The most she had to lift at that jobs was 15 or 20 pounds. (*Id.* at 50.)

- In 2013-2014, she worked for Walmart for about a year. She was a marketing representative and handled membership accounts for Sam's Club. At that job she had to lift 50 to 60 pounds occasionally. (*Id.* at 50-51.)

- She worked for K&K Interiors, a wholesaler of home decor items, as a customer service and salesperson. The most she had to lift at that job was 20 or 30 pounds. (*Id.* at 51.)

- In 2010, she worked for State Collections and Recovery, a collection agent. Her job was sedentary, and mostly done over the phone. She didn't have to lift "more than maybe a couple of pounds of files." (*Id.* at 52.)

- She worked for LMN Development for several years at Kalahari Resort. She was their guest service manager, and handled "all the guest related issues," including event planning and decorating. The most she had to lift at that job was 50 or 60 pounds. (*Id.*)

- She worked part-time for Elder-Beerman for about a year, as a beauty advisor for Clinique. (*Id.*)

- She was a marketing representative for Restore Pro, "on the road all day" selling emergency-type services. The most she had to lift at that job was 50 pounds. (*Id.*

8

at 52-53.)

- She worked as a customer service rep for O.E. Meyer selling home health equipment.  Some of the work was over the phone, but the majority was selling to customers who came into the showroom.  The most she had to lift at that job was 20 or 30 pounds.  (*Id.* at 53-54.)

- At Sawmill Creek Resort, she did not hire or fire, but did schedule workers and oversee the work of others.  She supervised between 2 and 40 employees, depending on the type of event.  All her work occurred at the Resort.  (*Id.* at 53-54.)

- Working for Gannett involved being out on the road all day, going to businesses to promote special advertising offers.  She was carrying her laptop and marketing materials.  (*Id.* at 55.)

- Working for Sam's Club also involved being out on the road meeting with people "pretty much the entire time."  She did membership drives at business clients.  (*Id.* at 55-56.)

- At Kalahari Resort, she supervised others, scheduled others, hired and fired, and gave performance reviews.  (*Id.* at 56-57.)

- When she sold home health equipment, she lifted as much as 50 to 60 pounds, depending on the equipment.  (*Id.* at 57.)

- Her last job was at Whirlpool.  She left that job in February 2016, because she got really dizzy and felt sick.  She went home from work one day, and visited the ER the next day.  (*Id.* at  58-59.)

- She left her previous job at Gannett because the company was reorganizing, and she wanted "something more long-term."  (*Id.* at 59.)

- Before that, she left her job at Sawmill to join Gannett because she thought it would provide "a better opportunity, more money, better hours."  (*Id.*)

-  She was not having health problems when she left Gannett, and did not have health problems during her first 3 months at Whirlpool.  (*Id.* at 60.)

- Her dizziness "just came out of nowhere."  She was at work, and the person working beside her stopped the line because he saw her get pale and start to rock back and forth.  She couldn't stand up straight.  (*Id.*)

- The next day, she went to the ER.  The doctors there were concerned about her

blood pressure, and gave her medicine for vertigo.  She was also having chest pains.  They discharged her and told her to follow up with her doctor.  (*Id.* at 61.)

- She still does not know what caused the combination of migraines, vertigo and dysautonomia.  (*Id.*)

- She has had migraines "on and off for years, but never to this extent."  Beginning in February 2016, she was having them continuously, for three and a half months, with no relief.  (*Id.* at 61-62.)

- Currently, she has migraines about 20 days out of the month.  Sometimes they last a few hours, but sometimes "it'll carry on for a couple of days."  She takes medicine, but it doesn't seem to help.  During a migraine, she stays at home and keeps things "nice and dark and quiet."  (*Id.* at 62-63.)

- She takes Indomethacin, but it doesn't seem to do anything.  She keeps taking it because before she took it she was experiencing migraines every day, and since she began medication, they reduced to 20 a month.  She is afraid to stop taking it because the constant migraines might return.  (*Id.* at 64.)

- Indomethacin does not reduce the length of her migraines.  (*Id.* at 65.)

- She has dizzy spells every day.  About half the time she wakes up dizzy, and the rest of the time as soon as she sits or stands up, the dizziness begins.  If the dizziness is in combination with a migraine, it won't go away, but otherwise, it can come and go, lasting for a few minutes each time, randomly throughout the day.  (*Id.* at 66.)

- She takes Meclizine for her dizziness.  This seems to shorten "slight dizzy spells," but doesn't help with "full vertigo," when everything is spinning.  (*Id.* at 67.)

- She used to see psychiatrist Dr. Lowell and therapist Susan Lowell regularly for mental health treatment, but hasn't been for a few months.  (*Id.* at 67.)

- She takes Zoloft for depression.  She doesn't believe she would have depression without the other issues.  She didn't have it when she was working.  (*Id.* at 68-69.)

- She does very few household chores, and can only do them for a few minutes at a time.  Washing just a few dishes takes her 20 minutes because she has to keep stopping to sit down due to dizziness.  (*Id.* at 69-70.)

- Without assistance, she can only stand for "a minute or two."  To stand and take a shower, she uses a shower chair.  To walk, she uses a walker.  (*Id.* at 70.)

- When she is experiencing vertigo, she has "a lot of brain fog going on," and so its tough to concentrate even when she is sitting down. (*Id.*)

- She has issues with memory, including problems remembering conversations and appointments. (*Id.*)

- When she gets dizzy, she feels very unsteady. It has caused her to fall. Her most recent fall was a week and a half before the hearing. The summer before last, she fell and broke her foot. (*Id.* at 71.)

The VE testified Bath had past work as a catering manager, advertising sales representative, home furnishings sales representative, collections clerk, hotel/motel manager, business services sales agent, and general merchandise sales. (*Id.* at 73-77.) The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual with the same age, education and work experience as the claimant. Please assume . . . that the hypothetical individual has the following residual functional capacity. . . . A full range of sedentary work except she can occasionally climb ramps and stairs, she can never climb ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. She must avoid concentrated exposure to extreme heat or cold and to humidity. She can never be exposed to unprotected heights, dangerous moving equipment, hazardous machinery, uneven terrain or commercial driving. With respect to understanding, remembering and carrying out instructions, she's limited to performing simple routine and repetitive tasks but not at a production rate pace. With respect to the use of judgment, she's limited to work-related decisions. There should be no more than occasional There should be no more than occasional changes in workplace tasks and setting, and any changes should be well-explained. She should be limited to occasional contact with supervisors and occasional and superficial contact with coworkers and members of the public. And by superficial, I mean that verbal interaction is not necessary for the completion of assigned duties. Would this hypothetical individual be able to perform the past relevant work either as the claimant actually performed it or as those jobs are generally performed in the national economy?

(*Id.* at 78.)

The VE testified the hypothetical individual would not be able to perform any of Bath's past work. (*Id.*) The VE further explained the hypothetical individual would also be able to perform

11

other representative jobs in the economy, such as small products assembler, product sorter, or product mounter. (*Id.* at 79-80.)

Next, the ALJ changed the hypothetical to eliminate the limitation on interaction in the workplace. (*Id.* at 80.) The VE testified that if this eliminated the limitation on contact with the public, the hypothetical individual could work as a cashier or charge account clerk. (*Id.* at 81-82.)

The VE also testified that the normal tolerance for absenteeism is that three days or more absences for month preclude competitive employment. (*Id.* at 83.) She testified that while "there's no clean dividing line where work ceases in the competitive labor market," she felt confident stating that more than 20 percent of time spent off task would preclude employment. (*Id.*) Finally, she testified that some employers offer a place for employees to lie down if needed. (*Id.* at 85.)

## III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

12

First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Bath was insured on her alleged disability onset date, February 18, 2016, and the ALJ found that she was continuously disabled for a period of more than twelve months, until May 10, 2017, so was awarded disability benefits for that period. (*Id.* at 23.)

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2021.

2. The claimant has not engaged in substantial gainful activity since February 18, 2016, the date the claimant became disabled.

3. From February 18, 2016 through May 10, 2017, the period during which the claimant was under a disability, the claimant had the following severe impairments: disorders of the vestibular system; affective disorder; and anxiety disorder.

4. From February 18, 2016 through May 10, 2017, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that, from February 18, 2016 through May 10, 2017, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to extreme heat or cold, and to humidity, and she can never be exposed to unprotected heights, dangerous moving equipment, hazardous machinery, uneven terrain, and commercial driving. With respect to understanding, remembering and carrying out instructions, she is limited to performing simple, routine and repetitive tasks, but not at a production rate pace. With respect to the use of judgment, she is limited to work-related decisions. There should be no more than occasional changes in the workplace tasks and setting, and any changes should be well-explained. Lastly, she would be absent more than two days per month due to her impairment or treatment.

6. From February 18, 2016 through May 10, 2017, the claimant was unable to perform any past relevant work.

7. The claimant was a younger individual age 45-49, on the established disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above.

10. From February 18, 2016 through May 10, 2017, considering the claimant's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant was under a disability, as defined by the Social Security Act, from

14

February 18, 2016 through May 10, 2017.

12. The claimant has not developed any new impairment or impairments since May 11, 2017, the date the claimant's disability ended. Thus, the claimant's current severe impairments are the same as that present from February 18, 2016 through May 10, 2017.

13. Beginning May 11, 2017, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

14. Medical improvement occurred as of May 11, 2017, the date the claimant's disability ended.

15. The medical improvement that has occurred is related to the ability to work because there has been an increase in the claimant's residual functional capacity.

16. After careful consideration of the entire record, I find that, beginning May 11, 2017, the claimant has had the residual functional capacity to perform sedentary work as defined in [the Regulations] except she can occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to extreme heat or cold, and to humidity, and she can never be exposed to unprotected heights, dangerous moving equipment, hazardous machinery, uneven terrain, and commercial driving. With respect to understanding, remembering and carrying out instructions, she is limited to performing simple, routine and repetitive tasks, but not at a production rate pace. With respect to the use of judgment, she is limited to work-related decisions. There should be no more than occasional changes in the workplace tasks and setting, and any changes should be well-explained.

17. The claimant is still unable to perform any past relevant work.

18. The claimant's age category has not changed since May 11, 2017.

19. The claimant's education level has not changed.

20. Beginning May 11, 2017, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

21. Beginning May 11, 2017, considering the claimant's age, education, work experience, and residual functional capacity, there have been jobs that exist in

15

significant numbers in the national economy that the claimant can perform.

22. The claimant's disability ended May 11, 2017, and the claimant has not become disabled again since that date.

(Tr. 23-36) (citations omitted).

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388,

16

389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      Assignment of Error: Whether the ALJ followed Social Security Regulations in his evaluation of Bath's symptoms after May 10, 2017.**

Bath asserts that the ALJ erred by failing to evaluate the intensity, persistence and limiting effect of her symptoms after May 10, 2017 in accordance with Social Security Ruling 16-3p ("SSR 16-3p"). (Doc. No. 11 at 1, 13.)  She points to the fact that the ALJ explained his finding of medical improvement with the bare statement that the finding of residual functional capacity ("RFC") "is supported by the objective medical evidence contained in the record.  The treatment notes do not support the claimant's allegations of disabling conditions." (*Id.* at 34.)  She argues the ALJ failed to address her activities of daily living, the frequency and persistence of her symptoms, and the type, dosage or effectiveness of her medication, as required by SSR 16-3p.  (Doc. No. 11 at 13.)

The Commissioner responds that substantial evidence supports the ALJ's finding of medical improvement relating to Bath's RFC.  (Doc. No. 13 at 5.)  He asserts that the ALJ properly relied on Bath's reported self-improvement, lack of specialist treatment, and lack of ER visits due to migraines after May 10, 2017, as the basis for his finding.  (*Id.*)  He argues that the finding of medical improvement necessarily incorporates the detailed analysis of evidence supporting the finding of a period of disability, since "[t]he only difference between the RFC finding during the period when the Plaintiff was disabled, and the period since May 11, 2017, is the lack of absences limitations" in the latter period.  (*Id.* at 9.)

A "closed period case" is a case in which the ALJ makes a finding of disability for part, but not all, of the period during which a claimant alleges they were disabled prior to their hearing.  "In order to find a closed period of disability, the Secretary must find that at some point in the past, the

claimant was disabled and that, at some later point in the past, he improved to the point of no longer being disabled." *Gillespie v. Comm'r of Soc. Sec.*, No. 09-11191, 2010 WL 4063713, at *3 (E.D. Mich. Oct. 14, 2010) (citing *Long v. Sec'y of Health & Human Servcs.*, No. 93-2321, 1994 WL 718540, at *2 (6th Cir. Dec. 27, 1994)). The medical improvement standard defined in 20 C.F.R. §§ 404.1594(b)(1)[5] and 416.994(b)(1)(i) applies to closed period cases. *See Shepherd v. Apfel*, 184 F.3d 1196, 1198, 1200 (10th Cir. 1999).

The Sixth Circuit explains that "the central question" in reviewing a finding of medical improvement, " is whether the claimant's medical impairments have improved to the point where she is able to perform substantial gainful activity." *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007), citing 42 U.S.C. § 423(f)(1).  There is no presumption of continuing disability. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286  287 n.1 (6th Cir.1994). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).  20 C.F.R. § 404.1594(b)(1).  A medical improvement is related to an individual's ability to work only "if there has been a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities." 20 C.F.R. § 404.1594(b)(3). *See also Nierzwick v. Commissioner of Social Security*, 7 F. App'x 358 (6th Cir. 2001).

---

[5]  "Medical improvement" is defined in 20 C.F.R. § 404.1594(b)(1) as follows:

> Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).

In Section 14 of his decision, the ALJ explained his finding of medical improvement as follows:

> **Medical improvement occurred as of May 11, 2017, the date the claimant's disability ended.**  In May 2017, the claimant reported to Dr. Bauer that her symptoms were improving.  She did not return for treatment with Advanced Neurologic Associates after that visit.  Additionally, the claimant was not seen in the emergency room after May 10, 2017, due to her migraines.

(Tr. 32) (citations omitted) (emphasis in original). The only difference in the RFC determination from the prior period of disability was the elimination of the limitation that "[Bath] would be absent more than two days per month due to her impairment or treatment."  (*Id.* at 24, 32.)  Thus, the majority of the analysis that explained the ALJ's finding of disability was also relevant to the finding of medical improvement.  In the instant case, the ALJ's brief explanation is reasonable given that he was explaining the basis for finding a small improvement in RFC.

The "isolated treatment note" discussed by the ALJ is contained in the records of Bath's neurologist, Dr. Bauer.  (*Id.* at 642.)  The note is a record of Bath's May 10, 2017, appointment.  (*Id.*)  Dr. Bauer wrote that Bath reported she was "doing a lot better," and "still getting headaches but not as often or as long, still dizzy on and off but improved," but she had more lightheadedness.  (*Id.*)  As the ALJ notes, it was the only neurological treatment note from the period at issue, because Bath did not return for further neurological care.  (*Id.* at 32.)

Bath acknowledges this is not the only evidence the ALJ relied upon.  She argues that he improperly "infer[red] that the improvement was sustained," based on the fact that Bath did not seen her neurologist again in the 8-month period between that appointment and her hearing.  (Doc. No. 11 at 16.)  It is logical that the ALJ directly cited lack of medical appointments in supporting a finding that Bath would not be absent due to "her impairment or treatment."  It was appropriate for

the ALJ to consider the treatment that Bath sought and received, and to infer that the medication she was prescribed controlled her symptoms because she sought and received no additional treatment. *See, e.g., Kepke v. Soc. Sec. Admin.*, 636 F. App'x 625, 638-639 (6th Cir. Jan. 12, 2016) (finding the ALJ reasonably found Plaintiff's credibility was damaged based on her "routine and/or conservative treatment for the allegedly disabling impairments"); *McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 WL 687680 at *4 (6th Cir. May 19, 2000) ("Plaintiff's complaints of disabling pain are undermined by his non aggressive treatment."), citing 20 C.F.R. § 404.1529(c)(3)(iv)-(v) (ALJ can consider medication and other treatment when assessing credibility).

Bath does not mention the ALJ's statement that she "was not seen in the emergency room after May 10, 2017, due to her migraines." (Tr. 32) As the ALJ implies, Bath was seen in the emergency room during this period for a different ailment. In July 2017, she sought emergency treatment for rectal bleeding. (*Id.* at 672.) The records of this visit note a history of migraines, but do not mention current headaches or vertigo. (*Id.* at 672-76.) Subsequently, in August 2017, Bath underwent a colonoscopy and polypectomy. (*Id.* at 667-68.) Again, the records make no mention of current headaches or vertigo. (*Id.*)

Bath also acknowledges that the ALJ "makes a passing reference to an infusion," but argues the "the ALJ does not seem to recognize these [Depacon and magnesium] infusions as a continuing and significant treatment."[6] (Doc . No. 11 at 16.) She asserts that because she received a three-day

---

[6] The ALJ noted "[t]he claimant was seen at Firelands Regional Medical Center in September 2017, for infusion therapy secondary to migraines." (Tr. 32.) The fact that the ALJ did not specify the infusion therapy took place over three days seems to be the basis for Bath's allegation that the ALJ "misrepresented" the treatment record. (Doc. No. 11 at 1). The Court does not find the ALJ's description of the treatment inaccurate or misleading.

series of Depacon and magnesium infusions as treatment for her migraines in September 2017, and was treated with five of these infusions during period when the ALJ found her disabled, the ALJ should have inferred that treatment - and her condition - were unchanged. (Doc. No. 11 at 16.) However, there is a significant difference in the frequency with which she received these treatments. During her 15-month period of disability, Bath received five infusion treatments. (Tr. 378-86, 688-701.) During the subsequent 8-month period between the date the ALJ found medical improvement and the date of the hearing, Bath required this treatment only once. (*Id.*) This difference in frequency is relevant to the issue here: whether receiving this treatment would cause absenteeism in excess of two days a month. There is no basis to conclude that the ALJ failed to appreciate the connection between the September 2017 infusion treatment and those Bath received during her period of disability.

Bath asserts that the ALJ's analysis of medical improvement failed to meet the requirements of SSR16-3p. SSR 16-3p(2)(d) sets forth a list of factors that an ALJ may consider in evaluating the intensity, persistence and limiting effect of an individual's symptoms.[7] The Ruling explains that not

---

[7] These are the factors set forth in SSR 16-3p(2)(d):

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

all factors will be discussed in every decision, but "we will discuss the factors pertinent to the evidence of record." (*Id.*) Bath acknowledges that these factors were appropriately evaluated in the ALJ's finding of a period of disability. The change in the RFC was limited to a reduction in the amount of absenteeism. SSR 16-3p does not require the ALJ to restate the evidence on which he based the portion of his earlier findings which is unchanged.

Bath does not identify objective evidence in the record supporting her alleged continued disability that the ALJ failed to address. Indeed, the only medical evidence which she cites after the date the ALJ found medical improvement is the infusion treatment she received in September 2017. (Doc. No. 11 at 8.) Otherwise, the evidentiary basis for her claim is her hearing testimony. (*Id.* at 9.) She argues that the ALJ should have given greater weight to the description of her subjective symptoms in her testimony at the hearing based on the evidence in the record as a whole. (*Id.* at 17.)

At its core, Bath's argument is that the ALJ should have interpreted the evidence differently. However, Sixth Circuit law is clear: "as long as substantial evidence supports the Commissioner's decision, we must defer to it, 'even if substantial evidence in the record would have supported an opposite conclusion.'" *Warner v.Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004), *quoting Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). The ALJ's determination that Bath's condition was improving is supported by substantial evidence in the record. Therefore, it should be AFFIRMED.

---

Soc. Sec. Ruling 16-3p (S.S.A. Oct. 25, 2017).

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.


*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 24, 2020


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**